The next case for oral argument is Appeal No. 25-2353, United States v. Bowers Good morning, and may it please the Court, Counsel. Jared Hamernick here for Jordan Bowers. In this case, we're challenging three different guideline provisions that collectively more than doubled my client's sentencing range. The first enhancement that we're challenging is the prohibited person enhancement. We think the district court was wrong to apply that enhancement without any evidence that my client knew the status that prohibited him from possessing firearms. Secondly, we think the district court was wrong to apply the multiple firearms enhancement because his Glock switch-equipped pistol was found alongside two other normal handguns. Those other handguns, though, first, they were not unlawfully possessed, and here we're referring to Application Note 5, Section 2K2.1. Those other handguns were not unlawfully possessed for two reasons. One, again, there's no evidence that my client knew the status that made it unlawful for him to possess those guns. And second, we contend he had a Second Amendment right to possess them. But even if we're wrong about both of those points, possessing simultaneous possession of normal handguns and a machine gun are not relevant to one another unless there's something that ties those two possession offenses together, and here there's nothing beyond contemporaneous possession. Finally, as you know, we strongly argue that Mr. Bowers acted in self-defense when he shot back at would-be murderers who had committed a drive-by shooting at his house. As you know, 20 bullets were fired at him, his family, those gathered to celebrate the life of his father. Those bullets went everywhere, including literally into his headboard. And so we think on this point, just to be clear about our point here, we think the district court basically got Indiana's law of self-defense incorrect by not adopting an in-the-moment subjective standard from my client's point of view, and rather relied on hindsight to say that the shots were fired late. With respect to the knowledge requirement, in addition to showing that Bowers knew marijuana possession was unlawful, are you arguing that the government must establish that he knew that he met the standard of a habitual user, or are you saying that the government must show that he knew habitual users could not possess firearms? The first aspect of your question, Your Honor. So we're not saying that he would have to know that he was a habitual user in the sense that he was a habitual user under the law. What he had to know is that his use was sufficiently regular and contemporaneous that it made him an unlawful user, as the case law defines that term. And this is where we rely pretty heavily on Cook, which has this language where it's not just enough that you should know that you are an unlawful user, but that you actually have to know that. So it's a subjective, actual knowledge standard, but we're not going the further step in saying that he would have had to know, as the law says, that he's a habitual user, that his use made him a habitual user. He just had to know the facts that would have led to that conclusion. Are you only, under the Cook standard, are you only contesting his knowledge that his use was unlawful, or are you also contesting his knowledge that it was regular? So I don't think we're contesting that it was regular. That he knew it was regular. Right, yes, he definitely knew how often he was using marijuana. That's why I asked. I don't think I can stand here with a straight face and say otherwise. Of course he knew that, but that was true in Cook as well, in the support still reversed the conviction on plain error review, given that there was no evidence that he actually knew that he was an unlawful user, just that he should have known. But this isn't a challenge to a conviction. It's a challenge to a sentencing guidelines enhancement, and you have to get over the threshold hurdle that REHAFE applies to the guidelines, and in particular this guideline, to even get to the factual question about whether he knew and what unit of knowledge is important. That's right, and I appreciate the question, because I actually want to clarify what we are, and are not arguing in that regard, because as I went back and was looking at the briefs again, it was a little bit more muddled than I wish it was. So we're not saying that REHAFE applies to the guidelines generally speaking, or even to 2K2.1 generally. What we're saying is that REHAFE matters because the guideline ties prohibited person status to 922G. So in order to understand what it means to be described in 922G, you have to know what 922G requires, and in order to understand what 922G requires, you have to understand what REHAFE holds, is the applicable mens rea for the statute. So that's our point. It's not that REHAFE imports, sort of broadly speaking, a scienter or knowledge or mens rea requirement to the guidelines writ large. It's much narrower and focused specifically on the statutory cross-reference. Our law distinguishes between whether somebody is a prohibited person and whether or not they can be convicted of it. So given the language described in the guideline, why should we read that to require they can be convicted of it rather than they have the status of being a prohibited person? Yeah, for a couple of reasons. First of all, just to push back on the premise a little bit, we don't contend that the government had to be able to convict my client, to be able to convict him, because the standard of proof here is lower. So it's not beyond a reasonable doubt it would be the lower preponderance standard, and so we're not contesting that point. But I think that matters. Now, to get to the nub of the question, if we were just looking at this phrase described in 922G in a vacuum, I think I'd have a little bit tougher time. But we're not. I think we have to look at it within the context both of this court's case law, which I think Grapp and Gevedon both say that, first of all, we're interpreting 922G and the prohibited person enhancement in tandem, that a prohibited person is one prohibited by 922G, I think is the language from Grapp. And then you have, I think you also have these clues from the 2001 amendments, where the Sentencing Commission previously had listed out statuses, the statuses that would make one a prohibited person, including a regular or unlawful user of a controlled substance. And they took all of that out, and they substituted in the statutory cross-reference to say described in 922G. And in doing so, what they told us is that they were doing so specifically to adopt a statutory standard. So I think that is really quite important here. On the government's reading, that amendment was completely meaningless. It didn't do anything. But the Sentencing Commission knows how to tell us when it's making purely stylistic revisions to the guidelines, and they weren't doing that here. They said they were adopting the standard. But the guideline modification did not refer to 924A2, which is what adds the knowledge requirement. So that's right. I don't contest that at all. But my point is that once you get to 922G, it's not like 922G is not a strict liability statute. I totally understand it. The word knowingly is located in another provision. But I think the Fifth Circuit confronted a similar situation in the Sosa case, where this was before Rahaf, but they still said that 922G2 has an intent requirement built in. And so the government still has to prove that intent requirement. That's the applicable mens rea for 922G2. That mens rea was listed in 921, Section 921. So I think it's the same point, which is that the cross-reference brings in the whole statute. And the whole statute, the Supreme Court has told us in Rahaf, has a mens rea of knowingly in Section 922G. And I think this Court's pattern jury instructions, for example, also sort of recognized that 922G is not a strict liability offense. It has a requirement that the person act knowingly both as to possession but also as to status. So that's certainly our – I think that's the best argument that we have for why 922G and the mens rea requirement comes alongside the prohibited person. I think our point about – Sorry. I'm sorry. If you have a question, I'd love to entertain it. Finish your thought. I'm sorry. Well, I was going to pivot to our second point here, which is that under Application Note 5, the multiple firearms enhancement requires unlawful possession. And I just don't know how you can unlawfully possess a firearm without actually violating some statute. There's no evidence here that might – again, this is the Rahaf point. There's no evidence that my client knew the status. The government didn't try to argue that point below. And the Court just didn't find it. So to the extent that the Court might be interested in finding a way to sort of split the difference between these two provisions, unlawful possession I think plainly has to incorporate the full statute. This was the case that – this is the point that I think the Tenth Circuit was making in the Campbell case, where in that case there was no evidence that the firearm had moved in interstate commerce. There was no jurisdictional look. And the Tenth Circuit said you can't use that firearm to increase the number of firearms that the person is responsible for. So just on the statutory point, I think that's a very straightforward analysis because the district court did not make any findings of fact about that and so the government didn't have to prove it. We think that's incorrect. And, I mean, that argument is about as straightforward as that. We have raised a secondary Second Amendment point. I'm not going to spend much time on it unless Your Honors want me to. We've briefed it as well as we could, but also Himani is going to be decided within the next – probably within the next month or two months, and that would direct the analysis. So under constitutional avoidance principles, I don't think the court has to get there if you agree with us on the statutory point. So unless you have questions, I'm going to leave that alone for now. It seems like at best you have forfeited your Second Amendment argument. That's right. Which it sounds like you agree. Discretion being the better part of valor, we took a second look after the government's brief, and I think we have to concede that it was forfeited. We don't think it was waived because there was no affirmative relinquishment of that. There was this sort of colloquy with the district court. How could there be plain error then given how unsettled this issue is based on the case law you've provided us with? Sure, so just to take a stand, I don't think the case law actually is all that unsettled. I think that between Seward and Connolly, to me, there's a very clear consensus developing about this. But as you know, plain error is assessed at the time of decision, at the time of the appeal, and given what the Supreme Court may or may not say, that will make it either plain or not plain. Actually, it may just make it error or not error as well. Now, with respect to self-defense, you focus on how many seconds elapsed, but isn't it equally important that during those seconds, the vehicle that posed the danger was moving away from Mr. Bowers? And doesn't that make the 11 seconds that passed between the time it was fired at and the time that it returned fire more significant? Because the vehicle, you know, that was posing the threat had not only stopped firing, but had been moving away from him during those seconds. Sure, so we know that the vehicle moved at least as far away as the video camera shows us. And I assume that you're familiar with the video. It's a doorbell camera from across the street. It shows about two homes on either side. So we know that the vehicle went at least that far. We don't know what happened after that. Now, the reason that I focus on sort of the 5 1⁄2 seconds versus 11 seconds is because in the district court, that was the district court's focus. And so that's why I wanted to sort of unpack and understand what was the actual timeline of what was happening there. The reason, though, that I think it matters that, you know, whether you focus on the 11 seconds or the 5 1⁄2, Indiana law is very clear that you adopt the defendant's subjective perspective in the moment, right? And what we knew is that he had gone diving for cover by the side of his house as these shots were ringing out. So he knew that the car was driving past. There's then a couple seconds of silence, and another eight rounds are shot. So from his perspective in the moment, sort of literally in the snowbank by the side of his house, he cannot possibly have known whether those shots were coming from the folks that had just shot at him or from 425 feet away, you know, roughly the corner to corner in Soldier Field. Like, this is not a long distance. But I think his own statement made clear that he was firing well after the threat had passed. He said something like, I shot late as hell, and I probably didn't even hit the car because I shot late as hell. I mean, how could the district court have clearly heard if he had no longer any reasonable fear of, you know, death or bodily injury? Yeah, I think it's clear error because it's a mistake of law, right? The comment that the court was relying on that the government makes much of is this point that he says he shot late as hell. Forgive the language, but I mean, that's what he said, right? But he said that months after the offense, expressly based on the footage. And Indiana law is crystal clear that you cannot use hindsight to second guess the reasonableness of a person's in the moment, literally under attack. It's evidence of what he was thinking at the time. I think it's evidence of what he saw after being confronted with the footage. Because the footage shows one thing, but if you're literally diving for cover while bullets are flying, I think that matters. But when he was shooting, it was clear he was shooting at the car that was already gone, not in some other direction where shots may be coming from. Oh, right, but my point is that he subjectively thought that those bullets were coming from that car. The second round of bullets were coming from the car that had passed. So I'm not saying that he should have shot in the other direction. What I'm saying is that he subjectively, in the moment, returned fire after hearing two bursts of gunshots. And I think waiting for the second one actually makes it more reasonable in the moment, right? Because that tells you that there's a second attack that's happening and you need to stop it. So that's our point, is that the government has not proven that the threat was over or that the car was gone, just that it left the door open in this frame. I see I've got 15 seconds. If I can reserve those, I'll keep going. Sure, I'll give you a minute. Thank you very much. Mr. Falvey, good morning. Good morning, Your Honors. Joe Falvey for the United States, and may it please the Court. In imposing a below-guideline sentence in this case, the district court made three correct guideline decisions. It found that the defendant was a prohibited person, that he possessed three relevant handguns, and that he did not act in self-defense when he fired his machine gun in a dense residential neighborhood at a car down the block that was driving away from him. I'd like to start where my friend on the other side started with the prohibited person enhancement. That enhancement applied because by the defendant's own admissions, he was a regular user of marijuana for years before his offense. That made him a person described in Section 922G3 under Application Note 3. The defendant's primary counterargument is that that enhancement requires proof of knowledge based on rehab, but that's not correct. The Sentencing Commission knows how to impose a knowledge requirement or a stance requirement when it wants to, and it chose not to do so here. For that basic proposition, a good site I'd point the Court to is Chief Judge Sutton's recent opinion in Sewell. It shows that the Sentencing Commission, across a variety of contexts, elsewhere in the guidelines and in 2K2.1 itself, knows how to impose a knowledge requirement and is able to do so when it wants to, and it did not do so here. I'd also stress that rehafe involved a different statutory provision. At bottom, rehafe involves Section 924A, not Section 922G3. Although it did leave open that it might apply to other 922G provisions. It contemplated that possibility, but here, for a 922G3 offense, the knowledge requirement today comes from Section 924A. So for the 922G3 offense, that's where the C&T requirement comes from. And the guidelines don't incorporate rehafe in the text that they use. I'd also emphasize that SOSA, the Fifth Circuit opinion that the other side invoked, actually supports us, Your Honors. So SOSA answered a related question by looking to the text of Section 922G. The provision at issue there was 922G2, the fugitive from justice provision, and the Court determined whether that provision, by its very terms itself, had a C&T requirement by looking to those terms. And that provision does, because fugitive from justice, the meaning of that word, includes C&T, because a fugitive is somebody who flees for a certain purpose, to flee prosecution. That actually supports us, because here, if you look at the terms of 922G3, they don't, by their own terms, include a C&T requirement. That comes from 924A. SOSA expressly distinguished 922G provisions that, by their terms, may or may not include a C&T element. So for those reasons, we think SOSA actually supports us, and if that's the best circuit case for the other side, I think our position is quite strong on this issue. Are there other guideline provisions that use the described-in language, and are they helpful at all? Your Honor, not that I think we've cited none that use that particular described-in language, but there are a variety that use the language of knowledge or CENTER in 2K2.1 itself. So there's enhancements that apply if someone knowingly transports weapons to somebody, knowing that they're a prohibited person. There's other enhancements that apply if somebody possesses a gun in connection with a criminal group, knowing that the group's primary purpose is criminal. And so I think those illustrate that this commission is capable of adding a knowledge requirement when it wants to. I'd also highlight this Court's decision in Price, which stressed that as a general matter, REHAFE does not apply to guideline enhancements. So if that's the general rule, we think that this case is not a good candidate to make an exception. Barring any further questions on the first issue, I'd like to move to the second issue, which is the multiple firearm enhancement. On this issue, we believe this was properly applied because the defendant unlawfully possessed three handguns, his machine gun, and then the two others that were unlawfully possessed under Section 922G3. And those other handguns, those other two handguns were relevant. They were relevant conduct here. On this issue, I think it's quite important that I stress that the issue is reviewed for clear error. So the relevant conduct determination is subject to clear error in this court. And we don't think the district court clearly erred here in holding that all three firearms were relevant to the offense. That issue is based on a number of factors. Most importantly, timing, similarity, and repetition. And here the timing is strongly in favor of relevance. All three handguns were possessed at the exact same time. And in fact, in the exact same place, under the mattress. Mr. Felby, regarding your relevant conduct argument, other than location, what is the connection between the offense of conviction and the guns found? Is it just that they're all weapons? I mean, would it be different if drugs were found under the mattress next to the machine gun? Your Honor, we think there are a number of connections. So first the handguns were all quite similar. They were all handguns. They all had extended magazines in them. And one had one additional feature. It had a Glock switch, which converted it into a machine gun. But based on the extended magazines, they all shared the commonality of being weapons equipped to deliver a large amount of fire quite rapidly. One has a machine gun, but the others, the extended magazines enabled a large volume of fire as well. So in that sense, we believe they're quite similar. Another point I'd like to address on this issue is Simmons. The defense cites Simmons from the Fourth Circuit, which I think at first blush is a nice case for the defense. I'll grant them that. But there are a few important differences that I think would be worth flagging. The first is that Simmons was a DeNovo review case. The Fourth Circuit's case law called for DeNovo review in that case, they said, because in the circuit court, the district court had not done a careful enough analysis. The court acknowledged that in general, relevant conduct is a very fact intensive analysis, but because the district court had done a somewhat cursory job there, DeNovo review applied on appeal. Well, that's not the case here. The review here is for clear error. And I'd note the district court was quite meticulous and quite careful in the course of this litigation. The district court had multiple hearings at each hearing, recapped and discussed the different objections in play and was ultimately issued a written opinion on the issue. And so for those reasons, we think Simmons is quite distinguishable. Regardless of what may or may not be the case on DeNovo review on clear error here, we think the district court did not clearly air and finding that all three handguns were relevant. One other. Multiple firearms enhancement, I think, is a harder argument for you than the prohibited persons. Because it says that you have to unlawfully possess the firearms. And how can you unlawfully possess if you can't satisfy all the elements? Your Honor, I agree with you. I think it is probably a little bit harder for us on the second issue. So in other words, I don't think if you win on the first issue, you win on the second automatically, which the briefing seemed to suggest that from both sides, I think the second issue is just a little, it's not as straightforward as the first. I agree. Your Honor. It's slightly tougher. The reason why I think one reason why I think we still prevail is if you look at the text of nine 22 G itself, it uses the same word as the note. It uses the word unlawful. And nine 22 G says it is unlawful to be a person described in nine 22 G three. So that's the language that the nine 22 G itself uses without any mention of center. And then the guidelines use that exact same language. They say that the enhancement applies when someone unlawfully possesses weapons. So because of the match between the language there, we think ultimately the two issues do rise and fall together or at least, or at least fall together. And, uh, and do not import a CNC requirement from outside nine 22 G they don't import the knowledge requirement from nine 24 a your Honor. So barring any further questions on the second issue, I'd like to spend the remainder of the time talking about the third issue, which is the self-defense issue and the enhancement for committing criminal recklessness here. This issue too is reviewed for clear error. And in our view, the district court did not clearly air in finding that the defendant did not act in self-defense. A couple of important facts from the record to put on the table here. So the car that drove by the defendant's house shot, shot, shot first. We acknowledge that some number of seconds went by and then another burst of gunfire from the opposite direction. I believe this was from the Northeast. The car drove away to the South and number of seconds went by. So 11 seconds elapsed between when the car shot and Mr. Bauer shot. And then more than five more seconds elapsed between when the other burst of gunfire from the opposite direction occurred and Mr. Bauer shot. So even those, even if we're just looking at those five seconds, that's still a significant amount of time. Five, five seconds ticking off is actually quite a long time. And it's also important. The defendant did not fire back from hiding. He did not fire back from a snowbank where he was taking fire from. He instead came out of hiding. He advanced around his house, looked down the block, took aim, and then fired his machine gun in a dense, dense residential neighborhood. So those, that sort of conduct takes this case out of outside of a scenario where the defendant was taking incoming fire and firing back at the same time. The two best cases for us on this are probably Wilson and Cornelius. In both of those cases, the, the, the defendant did not act in self-defense for one basic reason. Cornelius calls this the dispositive fact. And the dispositive fact in Cornelius was that the defendant fired while the vehicle was driving away from him. Wilson is similar. And Wilson, uh, at the end of the day is not just a case limited to situations where the defendant shot first. The court there reasoned in the alternative that even if the defendant shot second, even if the defendant had been under attack, he still could not claim to self-defense because he shot at the car while it was driving away from him. How do you respond to the defendant's argument that the district court legally erred, not factually applying it, but legally erred because she didn't look at it from the defendant's subjective perspective at the time. Your Honor, we don't think that that's what occurred here. I think the district court applied the correct legal standard and based on the Indiana cases that it discussed and concluded that on this record, the reasonable fear of injury to himself or others, uh, was extinguished by the time that the district court, or by the time that the defendant fired. And even if, um, this court may or may not have decided the issue differently in the first instance, uh, under the clear air air standard, we think that any error here certainly was not clear. Your Honor. So for that reason, we think that the self-defense or sorry, excuse me, the other felony enhancement was properly applied here. Barring any further questions on the third issue or any others, the government would ask the court to affirm. Thank you. Thank you. Judge Rolfe. I'm sorry. Did you have another question? No, I was just saying, thank you. Mr. Hammerdick, we'll give you a minute.  And then moves pretty fast. And so it was five and a half seconds. Um, so let me just start where my friend left off. The, the, the district court relied really heavily on the Hughes case. You, you can, I know that you've read it. It distinguishes itself. My client did not chase somebody down and fire into a Walmart after he already shot the guy four times. This was an 18 year old kid in the heat of the moment would just had a drive-by shooting conducted on himself. Others were gathered to celebrate his father's life. I think anybody colloquially would call that self-defense and Indiana law confirms he was acting in self-defense. Uh, just any of to come back to one of the questions that you had, uh, very briefly about other guideline provisions. I'm sorry for jumping around here. This is, um, other guideline provisions that use the described in a statute formulation. We've tried to catalog them on page seven. I might have missed some, but, but the government's reading of what it means to be described in a statute and reading out mens rea by the described in language. I think we'll, we'll really have serious implications for a number of other provisions that we've tried to catalog. Um, and then finally, Cornelius is of course, an unpublished decision and it's not binding on this court, uh, despite any similarities that might have. So if there are no further questions, we would ask you to reverse and remand. Thank you. Thanks to both counsel. The court will take the case under advisement.